# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and MICHAEL S. REGAN, in his official capacity as Administrator, United States Environmental Protection Agency,<br><br>Defendants. | Civil Action No. |

---

## COMPLAINT

---

## I.     INTRODUCTION

1. This dispute concerns the U.S. Environmental Protection Agency's unreasonable delay under the Clean Air Act.

2. For the reasons set forth below, the Center for Biological Diversity files this complaint against EPA and Michael S. Regan in his official capacity as Administrator of the EPA (together referred to as "EPA"),

asking this Court to compel EPA to complete its review and take final action on Pennsylvania's state implementation plan.

3. At the time of the filing of this lawsuit, it has been over a year and 8 months since the United States Court of Appeals for the Third Circuit granted EPA's motion for voluntary remand in *Center for Biological Diversity v. EPA*, No. 21-1279, slip op. (3d Cir. Sept. 3, 2021), which requires EPA to further review its initial approval of Pennsylvania's SIP revisions addressing Reasonably Available Control Technology requirements for certain sources of Volatile Organic Compounds under the 2008 ozone National Ambient Air Quality Standards (NAAQS).

4. Since the voluntary remand, EPA has not published a final rule detailing its new analysis or decision regarding Pennsylvania's state implementation plan.

5. These delays create significant harm: EPA admits that exposure to ozone pollution causes emergency room visits, hospital stays, and premature death. *See* 80 Fed. Reg. 65,292, 65,294 (Oct. 26, 2015).

6. Those most susceptible to harm from ozone pollution are children, elderly, individuals with chronic lung disease like asthma and COPD, and those who work outside. *Id*. at 65,322.

7. EPA's continued delay in its further review of Pennsylvania's state implementation plan leaves Pennsylvania vulnerable to negative, and in some cases irreversible, health effects due to their continued exposure to ozone.

## II.   JURISDICTION AND VENUE

8. This action arises under the Clean Air Act's citizen suit provision, 42 U.S.C. § 7604(a): "[t]he district courts of the United States shall have jurisdiction to compel . . . agency action unreasonably delayed."

9. This Court therefore has jurisdiction over this action pursuant to 42 U.S.C. § 7604(a) (agency action unreasonably delayed) and 28 U.S.C. § 1331 (federal question). The relief sought is authorized by 28 U.S.C. § 2201 (declaratory judgment) and 28 U.S.C. § 2202 (injunctive relief).

10.   Pursuant to 42 U.S.C. § 7604(a), the Center sent EPA a Notice of Intent to Sue on October 27, 2021, which the Administrator received the same day. More than 180 days have passed since the

Administrator received the Notice. The Administrator has not remedied his violations of the Clean Air Act as alleged in the Notice. An actual controversy therefore exists between the parties.

11.    Any final action on Pennsylvania's state implementation plan is reviewable in the U.S. Court of Appeals for the 3rd Circuit. Pennsylvania is in the 3rd Circuit. Therefore, venue is proper in this Court pursuant to the Clean Air Act, 42 U.S.C. § 7604(a).

### III.   PARTIES

12.    Plaintiff the Center for Biological Diversity is a non-profit 501(c)(3) corporation. The Center for Biological Diversity has over 89,000 members throughout the United States and the world.

13.    Based on the understanding that the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked, the Center for Biological Diversity is working to secure a future for animals and plants hovering on the brink of extinction, for the ecosystems they need to survive, and for a healthy, livable future for all of us.

14.    Plaintiffs' members live, work, recreate, travel, and engage in other activities throughout the areas at issue in this complaint and

will continue to do so on a regular basis. This includes a member of the Center who lives in Philadelphia with her wife and child and has asthma.  Pollution in the affected areas threatens and damages, and will continue to threaten and damage, the health and welfare of Plaintiffs' members, as well as their ability to engage in and enjoy activities, particularly outdoor activities such as walking, biking, hiking, and playing with their children.

15.   EPA's failures also harm Plaintiffs' members' welfare interest in using and enjoying the natural environment. Ozone damages plant life and natural ecosystems, thus harming Plaintiffs' members' recreational and aesthetic interests in the areas at issue in this complaint.

16.   In addition, EPA's failure to timely perform its mandatory duties adversely impacts Plaintiffs' members by depriving them of procedural protection and opportunities, as well as other information they are entitled to under the Clean Air Act.

17.   The above injuries will continue until the Court grants the relief requested. A court order requiring EPA to promptly undertake its

mandatory duties would redress Plaintiff's' and Plaintiff's members' injuries.

18.    Defendant Michael S. Regan is the Administrator of the Environmental Protection Agency and is sued in his official capacity.

19.    Defendant Environmental Protection Agency is a federal agency charged with the implementation of the Clean Air Act, and, as part of that duty, is responsible for reviewing and taking final action to approve or disapprove state implementation plan submittals.

## IV.   FACTS GIVING RISE TO PLAINTIFF'S COMPLAINT STATUTORY AND LEGAL BACKGROUND

### A. Unreasonable Delay

20.    Courts shall have jurisdiction to compel agency action under the Clean Air Act that is unreasonably delayed. 42 U.S.C. § 7604(a).

21.    The D.C. Circuit Court of Appeals has provided the following six factors to determine whether agency action has been unreasonably delayed ("TRAC Factors"):

     i.    the time agencies take to make decisions must be governed by a rule of reason;

     ii.   where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in

the enabling statute, that statutory scheme may supply

content for this rule of reason;

iii.    delays that might be reasonable in the sphere of economic

regulation are less tolerable when human health and welfare

are at stake;

iv.    the court should consider the effect of expediting delayed

action on agency activities of a higher or competing priority;

v.    the court should also take into account the nature and extent

of the interests prejudiced by delay; and

vi.    the court need not find any impropriety lurking behind

agency lassitude in order to hold that agency action is

unreasonably delayed.

*Telecomm. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984).

22.    Courts should also consider whether the delay may be

undermining the statutory scheme, either by frustrating the goal of

the statute or creating a situation where the agency is losing its

ability to effectively regulate. *Cutler v. Hayes*, 818 F.2d 879, 897

(D.C. Cir. 1987).

23.     Further, "delays that might be altogether reasonable in the sphere of economic regulation are less tolerable when human lives are at stake." *Id.*

## B. The Clean Air Act

24.     Section 184 of the Clean Air Act, 42 U.S.C. § 7511c, which sets forth the RACT requirements for the Pennsylvania submission at issue here, was added in the 1990 Clean Air Act Amendments. Pub. L. 101- 549 § 103; 104 Stat. 2448-450. In part, the Amendments responded to EPA's prolonged failure to bring nonattainment areas, especially ozone areas, into attainment under the generic, discretion-laden approach of the 1970 Act and the 1977 Amendments. *See, e.g., S. Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 886-88 (D.C. Cir. 2006). "No longer willing to rely upon EPA's exercise of discretion, Congress adopted a graduated classification scheme that prescribed mandatory controls that each state must incorporate into its [state implementation plan]." *Id.* These provisions were placed in subpart 2 of Part D, Title I; the generic provisions were retained in subpart 1. *Id.*

25.   Section 184 requires, among other things, each state within the Ozone Transport Region to implement RACT for sources of volatile organic compounds for which EPA has issued a Control Techniques Guideline ("CTG") as well as all other major sources of volatile organic compounds and nitrogen oxides. 42 U.S.C. §§ 7511c(b)(1)(B), (2), 7511a(f)(1).

26.   The 1990 Amendments also created the Ozone Transport Region, which is comprised of Pennsylvania, Connecticut, Delaware, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Rhode Island, Vermont, and the metropolitan area that includes the District of Columbia. 42 U.S.C. § 7511c(a).

27.   The Ozone Transport Region was created out of concern that interstate transport of ozone in this region "contributes significantly" to these states' high ozone levels. 42 U.S.C. § 7506a(a); *see also* 1 LEGISLATIVE HISTORY OF THE CLEAN AIR ACT AMENDMENTS OF 1990 1053 (Environment and Natural Resources Policy Division, Congressional Research Service, Nov. 1993) (remarks of Sen. Lieberman discussing importance to downwind states). 42 U.S.C. § 7511c(a).

28.    And, as elsewhere for ozone, Congress prescribed mandatory

control measures to be applied in the Ozone Transport Region,

including statewide implementation of RACT for categories of

sources covered by an EPA "control techniques guideline." *Id.* §

7511c(b)(1)(B).

29.    RACT has been defined by EPA as "the lowest emission limitation

that a particular source is capable of meeting by the application of

control technology that is reasonably available considering

technological and economic feasibility." *Sierra Club v. U.S. EPA*, 972

F.3d 290, 294 (3d Cir. 2020) (quoting 57 Fed. Reg. 55,620, 55,624

(Nov. 25, 1992)). The Third Circuit has recently stated:

> RACT is not designed to rubber-stamp existing control methods.
> It is a *technology-forcing* mechanism. When originally
> introducing the standard, the EPA noted that "the control
> agency, using the available guidance, should select the best
> available controls, deviating from those controls only where
> local conditions are such that they cannot be applied there and
> imposing *even tougher controls* where conditions allow."

*Id*. at 295. (emphasis added).

30.    Thus, RACT is not a mere paper-pushing exercise.  Instead, it "is a

technology-forcing standard designed to induce improvements and

reductions in pollution for existing sources."  *Sierra Club*, 972 F.3d at

294. Furthermore, "RACT is an important strategy for reducing NOx and VOC emissions from major stationary sources within areas not meeting the ozone NAAQS." *See* 83 Fed. Reg. 11,155 (Mar. 14, 2018).

31.   The Act creates a strict sequence of actions and deadlines for SIP submissions. Deadlines for state submissions are generally created by promulgation of new standards, 42 U.S.C. § 7410(a)(1), and by EPA's designation of nonattainment areas, *e.g., id.* § 7502(b).

32.   Here, the deadline for Pennsylvania's submission was two years after EPA designated nonattainment areas for the 2008 ozone standards. *Id.* § 7511c(b)(1); 40 C.F.R. § 51.1116(b)(2).

33.   Once EPA receives a SIP submission, EPA has 90 days to determine whether the submission is complete. 42 U.S.C. § 7410(k)(1)(B). If EPA fails to do so within six months, the submission is deemed complete by operation of law. Id. EPA then has one year to either approve, disapprove, or partially approve the submission. *Id.* § 7410(k)(2), (k)(3).

34.   These deadlines have consequences. If EPA finds that a state has failed to submit a required plan, or EPA disapproves a required plan, a two-year clock starts for EPA to promulgate a federal

implementation plan (FIP). *Id.* § 7410(c)(1). The state may avoid this by submitting a plan that EPA approves as fixing the deficiency. *Id.* A disapproval or finding of failure to submit a required plan also starts 18-month and two-year clocks for sanctions. *Id.* § 7509(a).

## FACTUAL BACKGROUND

### C. Ozone Pollution

35.   Ozone, the main component of smog, is a corrosive air pollutant that inflames the lungs, constricts breathing, and even kills people. *See* EPA, National Ambient Air Quality Standards for Ozone, 80 Fed. Reg. 65,292, 65,308 (Oct. 26, 2015); EPA, Integrated Science Assessment for Ozone and Related Photochemical Oxidants, at 2-20 to -24, Table 2-1 (Feb. 2013) (EPA-HQ-OAR-2008-0699-0405)("Science Assessment").

36.   Ozone-induced health problems can force people to change their ordinary activities, requiring children to stay indoors and forcing people to take medication and miss work or school. *See, e.g.,* EPA, Policy Assessment for the Review of the Ozone National Ambient Air Quality Standards, at 4-12 (Aug. 2014)( (EPA-HQ-OAR-2008-0699-0404)  ("Policy Assessment").

37.    Ground-level ozone, commonly referred to as smog, is formed by

the interaction of two pollutants, volatile organic compounds ("VOC")

and nitrogen oxides ("NOx"), with sunlight. *Sierra Club v. United*

*States EPA*, 972 F.3d 290, 293-94 (3d Cir. 2020).

38.    These pollutants can be emitted by upwind states and carried to

downwind states, causing ozone pollution there.  *EPA v. EME Homer*

*City Generation, L.P.,* 572 U.S. 489, 497 (2014).

39.    Ozone pollution causes severe health impacts, including increased

emergency room visits and hospital admissions, as well as premature

death. EPA, National Ambient Air Quality Standards for Ozone, 73

Fed. Reg. 16,436, 16,440 (Mar. 27, 2008). Children, the elderly, and

people with respiratory conditions are most at risk from ozone

pollution. *Id.* at 16,471.

40.    Ozone also damages vegetation and forested ecosystems, causing

or contributing to widespread stunting of plant growth, tree deaths,

reduced carbon storage, and reduced crop yields. Policy Assessment

at 5-2 to-3; Science Assessment at 9-1. The damage includes tree-

growth losses reaching 30-50% in some areas, and widespread visible

leaf injury, including 25- 37% of sites studied in just one state. Policy

Assessment at 5-13; Science Assessment at 9-40. By harming

vegetation, ozone can also damage entire ecosystems, leading to

ecological and economic losses. 80 Fed. Reg. at 65,370, 65,377.

41.     Recognizing that the previous ozone standards were inadequate to

protect public health and welfare, in 2008 EPA strengthened the

ozone NAAQS by lowering the standard from 0.08 parts per million

(ppm) to 0.075 ppm. 73 Fed. Reg. 16,436, 16,440 (Mar. 27, 2008).[1]

EPA determines attainment status for ozone through ambient air

quality monitoring. Compliance is based on the "3-year average of

the annual fourth-highest daily maximum 8-hour average

concentration." 40 C.F.R. § 50.15(b).

**D. NOx**

42.     In addition to being a precursor for ozone formation, nitrogen

oxides are a criteria pollutant by itself. "There are currently two

primary standards for oxides of nitrogen: A 1-hour standard

established in 2010 at a level of 100 parts per billion (ppb) based on

---

[1] In 2015, EPA strengthened the ozone NAAQS once again, reducing the maximum allowable "design value"—an average daily eight-hour level of ozone, *see* 40 C.F.R. § 50, App. U—from 0.075 parts per million (ppm) to 0.070 ppm. *See* 80 Fed. Reg. 65,292, 65,296 (Oct. 26, 2015).

the 98th percentile of the annual distribution of daily maximum 1-hour $NO_2$ concentrations, averaged over 3 years, and an annual standard, originally set in 1971, at a level of 53 ppb based on annual average $NO_2$ concentrations." EPA, Review of the Primary National Ambient Air Quality Standards for Oxides of Nitrogen, 83 Fed. Reg. 17,226 (Apr. 18, 2018).[2]

43.   While motor vehicle emissions are the largest single contributor to $NO_2$ in the ambient air, there are many other sources such as electric power plants, industrial facilities, soil, wildfires, and other forms of transportation, which contribute to the ambient air pollution across the country. *See e.g.* EPA, Integrated Science Assessment for Oxides of Nitrogen – Health Criteria, at lxxix, (Jan. 28, 2016) (EPA-HQ-ORD-2013-0232-0046).

44.   Exposure to $NO_2$ causes respiratory effects, such as triggering asthma attacks, causing chronic obstructive pulmonary disease, respiratory infection, respiratory effects in otherwise healthy populations, and respiratory mortality. *Id* at lxxxiii. Thus, there are

---

[2] Nitrogen oxides include both nitric oxide (NO) and nitrogen dioxide ($NO_2$). EPA uses $NO_2$ as the primary indicator for nitrogen oxides. *Id.* at 17,226-227.

also related increases in hospital admissions and emergency department visits for those suffering from asthma attacks, as well as decreases in lung function in children with asthma. *Id.*

45.    $NO_2$ also causes increased development of asthma over long-term exposure. *Id.* at lxxxiv-v. This impact is divorced from other factors such as socioeconomic status and exposure to smoking. *Id.* at lxxxv.

46.    For both short-term and long-term exposure, $NO_2$ can cause cardiovascular effects and diabetes, mortality, birth defects such as reduced fetal growth, and cancer. *Id.*

47.    Evidence also demonstrates that there are greater impacts and exposure to urban, low socioeconomic status, and nonwhite populations. *Id.* at lxxxvi.

48.    Finally, "given that asthma is the leading chronic illness and the leading cause of missed school days and hospital admissions among U.S. children, $NO_2$-related asthma attacks and asthma development have the potential to affect children's overall well-being." *Id.* at lxxxvi-vii.

**E. Ozone Implementation**

49.   States are given the primary responsibility for meeting the
NAAQS within their borders through state implementation plans
("SIPs"). 42 U.S.C. § 7407(a). The required elements of a SIP are
dependent in part upon the air quality in the that state, or portion of
a state, and in nearby states.

50.   EPA, in consultation with the states, must determine whether the
air quality in any area meets the applicable NAAQS set by EPA. The
process for classifying an area as attainment, nonattainment, or
unclassifiable is codified at 42 U.S.C. § 7407(d).

51.   The Act also establishes an Ozone Transport Region that consists
of Pennsylvania, as well as the States of Connecticut, Delaware,
Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New
York, Rhode Island, Vermont, and the metropolitan area that
includes the District of Columbia. 42 U.S.C. § 7511c(a).

52.   The Ozone Transport Region was created out of concern that
interstate transport of ozone in this region "contributes significantly"
to these states' high ozone levels. 42 U.S.C. § 7506a(a).

53.   Depending on a nonattainment area's classification and whether it
falls within an Ozone Transport Region, increasingly stringent

requirements apply for pollutants that are precursors to the formation of ozone—namely, volatile organic compounds and nitrogen oxides. 42 U.S.C. §§ 7511a, 7511c(b).

54.    In 2015 EPA issued its final rule for states submitting SIPs to address the 2008 8-hour ozone NAAQS ("the 2008 Ozone SIP Requirements Rule"). 80 Fed. Reg. 12,264 (Mar. 6, 2015).

55.    Because Pennsylvania is a state within the Ozone Transport Region, pollution sources throughout the state are subject to RACT.

56.    In the 2008 Ozone SIP Requirements Rule, EPA required RACT measures to be implemented by January 1, 2017 for areas classified as moderate nonattainment or above and for all areas of the Ozone Transport Region. *See Id.* at 12,280; *see also* 86 Fed. Reg. at 9,033 (confirming the January 1, 2017 deadline for Pennsylvania).

## V.    PROCEDURAL BACKGROUND

57.    On March 27, 2008, EPA promulgated revised NAAQS for ozone. 73 Fed. Reg. 16,436 (Mar. 27, 2008).  EPA then designated areas as attainment, nonattainment, or unclassifiable for the new ozone standards on May 21, 2012, 77 Fed. Reg. 30,088 (May 21, 2012), over

a year after the outer three-year limit for designations, 42 U.S.C. §

7407(d)(1)(B)(1).

58.    Under section 184 of the Act, Pennsylvania was required to

submit the relevant RACT provisions by May 21, 2014, two years

after these designations.  *Id.* at § 7511c(b)(1); 40 C.F.R. §

51.1116(b)(2).

59.    However, the Commonwealth did not.  This triggered an

obligation for EPA to, within six months, that is by November 21,

2014 find that Pennsylvania had failed to make the submission.  42

U.S.C. § 7410(k)(1)(B).

60.    EPA, in turn, missed the November 21, 2014 deadline.  Finally,

driven by a consent decree in a "deadline suit" filed by the Center for

Biological Diversity[3], on February 3, 2017, nearly three years after

Pennsylvania's due date for the SIP and over two years after EPA's

deadline, EPA issued the finding of failure to submit.  82 Fed. Reg.

9,158 (Feb. 3, 2017).

---

[3] *See Center for Biological Diversity v. McCarthy*, 4:16cv04092-PJH

(N.D. Cal.) Dk.#32, Revised Consent Decree.

61.     EPA determined that Pennsylvania failed to submit the RACT
        SIP and stated that RACT must be implemented "as expeditiously as
        practicable to meet a given NAAQS." *Id*. at 9,160. EPA noted that its
        finding started the 18-month and two-year clocks for sanctions, as
        well as the two-year clock for EPA to impose a FIP. *Id*. at 9,160-61.

62.     Over a year and a half later, on August 13, 2018, Pennsylvania
        submitted a SIP to the EPA to meet the RACT requirements. 85
        Fed. Reg. 80,616 (Dec. 14, 2020) (Final Rule).

63.     This created an obligation for EPA to approve, disapprove, or
        partially approve and partially disapprove the submission no later
        than February 13, 2020. 42 U.S.C. § 7410(k)(1), (k)(2), (k)(3).  On
        March 5, 2020, EPA proposed to approve the SIP submission.  85.
        Fed. Reg. 12,877 (Mar. 5, 2020) (Proposed Rule).

64.     The Center timely submitted lengthy and detailed comments
        urging EPA to disapprove the RACT SIP submission.

65.     The Center noted that, contrary to EPA's description of RACT as
        "technology forcing," Pennsylvania had relied on EPA
        recommendations from as long ago as the late 1970's.  Exhibit 1 at
        11-12.

66.    This was particularly problematic as EPA had failed to meet its

obligations under section 183(b) to review and revise the

recommendations.  *Id.* at 12.  The comment noted that EPA, in

addressing this failure, had promised the D.C. Circuit Court of

Appeals to "requir[e] each State to consider any new available

information in making its certification, which will then be reviewed

by the EPA as part of the SIP submission process."  *Id.*

67.    However, the Pennsylvania SIP submission lacked an adequate

record to show that the Commonwealth had done so.  *Id.* at 12-13.

The comments identified an emblematic example of the problem.  *Id.*

at 14.

68.    Pennsylvania relied on EPA recommendations from 1983 as RACT

for natural gas processing plants, even though EPA itself in 2007

updated the New Source Performance Standards for these facilities

and in 2016 updated its RACT recommendations to more stringent

requirements. *Id.* at 14-16.

69.    On December 14, 2020, ten months after the Act's deadline, EPA

approved the RACT SIP submission. 85 Fed. Reg. 80,616.

70.   Petitioner timely filed a petition for review on February 12, 2021. Dkt. 1, *Center for Biological Diversity v. EPA*, (3d Cir. 2021) (No. 21-1279).

71.   Shortly afterwards and before any briefing schedule issued, EPA sought an abeyance to review the Final Rule, citing President Biden's January 20, 2021 Executive Order, entitled "Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis," 86 Fed. Reg. 7037 (Jan. 25, 2021). Dkt. 10, *Center for Biological Diversity v. EPA*, (3d Cir. 2021) (No. 21-1279).

72.   Shortly after completing its review, EPA filed its Motion for Voluntary Remand Without Vacatur (EPA's Motion) on August 2, 2021. Dkt. 18, *Center for Biological Diversity v. EPA*, (3d Cir. 2021) (No. 21-1279).

73.   The Center opposed the motion for voluntary remand detailing the risk of delay by EPA if the court did not set firm deadlines as part of the voluntary remand. Dkt. 21, *Center for Biological Diversity v. EPA*, (3d Cir. 2021) (No. 21-1279).

74.   The Third Circuit granted EPA's motion for voluntary remand on September 3, 2021, without setting deadlines for EPA's remand and

declining to retain jurisdiction without written analysis of its reason for doing so. *Center for Biological Diversity v. EPA*, No. 21-1279, slip op. (3d Cir. Sept. 3, 2021).

75.    Pursuant to 42 U.S.C. § 7604(a), the Center sent EPA a Notice of Intent to Sue on October 27, 2021, which the Administrator received the same day.

76.    More than 180 days have passed since the Administrator received the Notice.

77.    The Administrator has not taken action and has not published a new final rule.

78.    It has been over 600 days since the Third Circuit remanded this Rule to EPA, and Pennsylvania's air quality continues to suffer unnecessary pollution during this needless delay.

## VI.   CLAIM FOR RELIEF

(Compel Agency Action Unreasonably Delayed)

79.    Under the Clean Air Act, this Court should compel agency action unreasonably delayed.

80. Nearly every deadline Congress set for the rulemakings at issue here in the CAA have been beset by extensive delays at every step of the process, sometimes years in length.

81. Under section 184 of the Act, Pennsylvania was originally required to submit the relevant RACT provisions by May 21, 2014, two years after designations for the 2008 Ozone NAAQS. *Id.* at § 7511c(b)(1); 40 C.F.R. § 51.1116(b)(2).

82. The extensive delays by Pennsylvania and EPA in every step of the process, which necessitated lawsuits to compel action, mean that the current congressional deadlines are already years late.

83. The most recent congressionally created deadline was when Pennsylvania finally submitted a SIP to the EPA to meet RACT requirements in 2018. 85 Fed. Reg. 80,616 (Dec. 14, 2020) (Final Rule).

84. This created an obligation for EPA to approve, disapprove, or partially approve and partially disapprove the submission no later than February 13, 2020. 42 U.S.C. § 7410(k)(1), (k)(2), (k)(3).

85. At the time of filing this complaint, EPA is almost three years past the Congressional deadline.

86.  Human health, including irreversible impacts such as death and

asthma attacks, and welfare are at stake while ozone concentrations

remain well above the NAAQS. Additionally, in areas that are in

attainment, the infrastructure state implementation plan is the

primary tool in place to address impacts on highly susceptible people

with respiratory conditions who can suffer even when ozone design

values are below the 70 ppb NAAQS threshold.

87.  These factors demonstrate that EPA has unreasonably delayed

taking final action on the remanded elements of Pennsylvania's state

implementation plan for ozone NAAQS.

## VII.  REQUESTED RELIEF

The Center respectfully request that this Court enter judgment against

EPA:

1.  granting declaratory relief by ruling that EPA has unreasonably

   delayed under the Clean Air Act;

2.  compelling EPA to take final action on the remanded SIP

   submittal at issue by a date certain;

3.  awarding costs and fees of this action to the Center;

4.  retaining jurisdiction over this matter to ensure compliance with
    the Court's order; and

5.  awarding such other relief as the Court deems just and proper.

Respectfully submitted this 16th day of May, 2023.

*/s/ Jennifer E. Clark*

JENNIFER E. CLARK, ESQ.
PA. Id. No. 200636
Fair Shake Environmental Legal Services
18 Campus Blvd.
Suite 100
Newtown Square, PA 19073
(267) 817-5917
jclark@fairshake-els.org

JEREMY MCKAY
ALEXA CARRENO
*Pro Hac Vice Applications Forthcoming*
Environmental and Animal Defense
501 S. Cherry St.
Suite 1100
Denver, CO 80246
(720) 722-0336
acarreno@eadefense.org
jmckay@eadefense.org

*Attorneys for Plaintiff Center for
Biological Diversity*